Mr. Hawkins. Thank you Chief Judge Owen and may it please the court. Four years ago Texas enacted SB 8 to prohibit live fetal dismemberment abortions. It's illegal to kill an animal in Texas by ripping it limb from limb. SB 8 extends that same protection and dignity to pain capable unborn children on the cusp of moment of fetal demise. It simply requires those who commit abortions to kill the unborn child in a more humane way before tearing her arms and legs off. In declaring SB 8 unconstitutional the district court applied the wrong legal standard to reach the wrong conclusion. Last year the Supreme Court's June medical decision made clear that SB 8's constitutionality must be assessed under Casey's undue burden standard. As the Chief Justice explained that standard asks two questions. First, whether SB 8 is reasonably related to a legitimate purpose. Second, whether SB 8 creates a substantial obstacle to abortion access. I'll start with SB 8's legitimate purpose. Mr. Hawkins, before you get too far the plaintiffs argue that if the district court did apply the wrong test the proper disposition would be to remand and not reverse and what is the state's response? Judge Willett, we don't think that a remand is appropriate here for several reasons. First, we think that this court is perfectly positioned to decide the question of law that's presented here, namely whether SB 8 is unconstitutional. The court has in front of it the full evidentiary record from a week-long trial. All that's left is to apply the law to that record and having convened the en banc court to decide that question we think now is the appropriate time to answer it. Second, I think it's perfectly clear from the district court's opinion what it would do even applying the Casey standard the way it did, that it would still rule against the state. So I don't think that we would gain anything from having the district court go back and do that again. If the district court did apply the wrong legal test, what measure of deference do we owe that court's factual findings? So Judge Willett, it's settled law that factual findings made in pursuance of the wrong legal standard are not entitled to deference. And so I think it's fair to say that the district or the district court's factual findings made in advance of the whole woman's health benefits and burdens balancing test do not merit any deference. And even if I'm wrong about that Judge Willett, even if they did, we would still submit that they are clearly erroneous for the reasons that your honor outlined in the dissent in this case. In particular, there's no fair way to read the record in a way that supports the the overwhelming majority of the district court's factual findings. Now why did the Eighth Circuit in Hopkins decide to remand? They were facing a very similar situation than this one, and they agreed with you that the Chief Justice's comment did change the legal standard. They did remand there, correct? That's right, Judge Higginson. They vacated the order that had been entered, and they remanded. What I think is different here is we've got a full final judgment, a permanent injunction following an extensive trial, and a district court order an opinion at the end of that trial essentially saying, number one, the state loses under the whole woman's health standard. But in any event, I think making clear the district court would rule against us even under the Casey standard. And so, Judge Higginson, I think it's fair to say the Eighth Circuit might have thought it would learn something new from the district court. I don't think that this court should reach that same conclusion. I think I read the district court opinion similarly. At the end of Part 8, it says, or examines only the effects of the provisions. Is that the closest that the district court came to saying a burdens only test? Judge Higginson, I'll admit the district court's opinion is a little myopic at times on this point, but I think that's a fair characterization. I think reading it holistically, including the part that Your Honor identified, I think it's indicative that the district court would rule against us even under the Casey test. Of course, that would be error for the reasons we've set out in our brief and the reasons I'm happy to discuss this morning, but we think there's little need. I would just add as a practical note, Judge Higginson, that the state enacted this law four years ago. For four years now, we've been wanting to enforce a duly enacted law to protect and ensure and ensure dignity for unborn Children. We've not been able to enforce that law for four years because of the district court's injunction. We respectfully submit that having convened the on bond court, the state is entitled to an answer as to more than able to provide that answer. Mr Hawkins. Uh, yes, Judge Elrod. Does SBA on its face prohibit D and E abortions? No, it does not. Judge Elrod. SBA only regulates the moments of fetal demise. The entire premise of the other side's on bond brief is that SBA is a ban on D and E abortions. That's simply not correct. SBA simply says that before performing a D and E abortion using forceps, the provider has to ensure fetal demise. And at trial, we put on evidence that there are numerous alternatives to live dismemberment that are safe, effective and available. So I think the plaintiffs are simply wrong to suggest that we've affected ban on abortions. The record just doesn't back that up. Mr Hawkins, if you perform an abortion where you dilate and then you use suction and then you use forceps to help evacuate the fetal material, have you? Are you conducting a D and E abortion? Well, Your Honor, the record isn't always clear on whether suction itself falls within the category of D and E abortions. But suction, I think the critical point, Judge Elrod, suction does not implicate SBA. And so if fetal demise is achieved through the use of suction, then SBA does says nothing further. The provider who has committed the abortion that way has complied with SBA. So you've dilated and you've used forceps, but you've used suction in the meantime to bring about the fetal demise. And that is an acceptable abortion procedure, according to the literature and the evidence in this record to 16.6 weeks LMP. Is that correct? Yes, Judge Elrod. Suction can be used up to 17 weeks LMP. The record supports that. And when suction is used to achieve fetal demise, that is SBA. And I'm happy to go through the record support that suction can be used up to 17 weeks. That would be helpful. I would particularly want to figure out where, if we were doing a facial challenge, what is the numerator and what is the denominator? It seems like there's only 17 to 18 weeks that might be a problem under the existing methods that are already commonly used. So what is the numerator and what is the denominator? Sure, Judge Elrod. I'll start with the denominator. I think it's common ground here between the parties based on Supreme Court doctrine that the denominator is the number of women potentially impacted by SBA. That, I think, would be the number of women who want to get a D&E abortion. The numerator is, I think, where the parties differ. And I'll make two critical points about the numerator. First, the plaintiffs have never quantified what the numerator is. They've speculated that some women might have idiosyncratic medical situations, contraindications, whatever else that may make some of the alternatives unavailable. But they've never done anything to quantify that. Second, it's certain from the record that whatever the numerator is, it's an amount to a large fraction. And that is because the record shows for the overwhelming number of women, the alternatives to live fetal dismemberment are safe, effective, and available. As I indicated earlier, we know that suction can be used up through 17 weeks. I would refer the court to the Dr. Dervish testimony at 2227, the Journal of Obstetrics and Gynecology at 2588, the Dr. Chereau testimony on that point. All indicate suction is available up to 17 weeks. We know that digoxin can be used to ensure fetal demise as early as 15 weeks LMP. There's Dr. Chereau's testimony on that at 2597. A PT affiliate at 2605 indicates that digoxin is available in all second trimester abortions. And so Judge O'Rourke, there's really no gap period. If suction can be used through 17 weeks, we know that digoxin can be used starting before 17 weeks. We can be confident that the numerator is going to be a very, very small number that cannot rise to the level of a large fraction. And it bears emphasizing... Dr. Hawkins, in the state's briefing three years ago, you stated that there have been zero reported complications related to using digoxin or any of the other fetal demise methods in the last five years. And I wonder, explain what the legal significance of that statistic is and have the providers ever offered contradictory evidence or refuted it? Sure, Judge Willett. So I think that statistic is helpful in illustrating that the alternatives to live fetal dismemberment are safe, available and effective, particularly safe. Everyone agrees that the abortion procedure itself carries risks just like any medical procedure. But what I think the record shows and what those statistics Your Honor cited confirm that the use of digoxin is exceedingly safe and does not lead to complications in any reported instances that we're aware of. And I think that should give the court comfort to rule in favor of the state based on Gonzalez. Gonzalez stands for the proposition that the state can regulate and even outlaw certain methods of abortion so long as there are safe, available and effective alternatives. What we've shown is that there are indeed safe, available and effective alternatives. And the statistic that Your Honor cited, I think is an important piece of that evidentiary record showing that digoxin is safe. And I'll just add, Judge Willett, that the court doesn't have to take my word for it. We've included in the record here the consent forms that the providers themselves give to their patients. These are pages 4307, 4308, 4439. These are consent forms asking the patients to consent to the use of digoxin to cause fetal demise prior to the DNA abortion. These consent forms say, I'll easier and safer. So the abortion providers have been telling their patients that digoxin makes the process easier and safer. And of course, they do that, as Your Honor pointed out in the panel descent to avoid the legal liability that they would face that comes with an accidental live birth or a violation of the Federal Partial Birth Abortion Ban Act. Yet somehow the plaintiffs would have the court believe that when it comes to using digoxin to becomes risky and experimental. How can the state assert several times in its briefing throughout the history of the case that point out how the plaintiffs after litigation started? This is the state's assertion. They changed their practices. They changed their forms regarding fetal demise methods. I wonder if you could flesh that out and explain what they change. Sure. Sure, Judge Stern, I think, is probably the best example. They initially, in fact, the form I quoted from a minute ago, that was the consent form that they used prior to this litigation. That's a 4307 where they talk about the importance of digoxin for making the process easier and safer. And yet shortly before they commenced this lawsuit, they changed their very consent form to a new one at 4308 that removes some of that language. Um, and they did so on the eve of I think that this court should rely on what the providers have been telling their patients consistently for years, which is that digoxin is safe and effective. I would also note that Planned Parenthood affiliate forms. This is a 44 38 and 44 39 require DNA patients to undergo fetal demise through digoxin prior to the procedure taking place. Um, and the form of 44 38 says you may choose not to have digoxin. This may mean that you will be referred to another provider for your abortion. So digoxin was was effectively required. My point, Judge, was we've got a long history of the plaintiffs, plaintiffs insisting to the patients that digoxin is safe, available, effective. And yet on the eve of litigation, one of them changed the form, and they're now insisting that it's risky and experimental. Mr Hawkins, what's the difference between the record in this case and the record in the 11th Circuit case? Just shows there's several significant differences, all of which stem from the fact that our record is far more robust. The district court in our case conducted a five day bench trial with something like 19 different witnesses,  exhibits. This is the most robust record that we've seen in any litigation in this country regarding a ban on live fetal dismemberment abortions. The 11th Circuit case has a much sparser record with nowhere near the robust facts that we have here. Just to cite one example, the 11th Circuit doesn't contain the 11th Circuit record doesn't contain the critical evidence that we put on here regarding the widespread routine use of digoxin. The insistence by the plaintiffs themselves that digoxin is safe and effective. There's other similar evidentiary deficiencies as well. But I think the critical point, Judge Jones, is the Supreme Court has emphasized in cases like June Medical, in cases like even Whole Woman's Health, that every abortion regulation rises and falls on its own terms based on the landscape in that state and the record that the state creates. The robust record we've created here is nothing like the robust record at issue in the 11th Circuit case. And that's why this court, I think, should disregard the 11th Circuit's decision as well as the 6th Circuit's decision and need not concern itself with the possibility of a circuit split. There would be no split because the records are entirely different. But following up on that, Chief Judge Karn's opinion is very thoughtful and very sensitive. But what Drew my attention more was Justice Thomas's concurrence in the denial of cert. And I'm sure you know it. He cites Stenberg. And then he very specifically notes that existing Supreme Court law does allow a district court to conclude from what he calls mixed medical evidence, that other abortion procedures are too Am I correct that the only way you prevail here is if you're right, that there isn't any mixed medical evidence that allowed the district court to come to the conclusion that digoxin is risky. Judge Higginson, I think it's right that Justice Thomas's writing in that case is a reflection of the record in that case. And I would agree with your distinction here is our record here cannot be fairly read to support the conclusions that the district court reached. And that's why I think that Justice Thomas would have a different take on this case than he did on the 11th Circuit case, just taking his writing on its own terms. Um, as as Judge Willard, I think, put it best in the panel of dissent. It's simply not fairly possible to read this record in a way that supports the district court's findings. To the extent there's any factual disputes in this record, Your Honor, they're all on the other side of the V. It's the other side that has said that digoxin is safe and effective, yet somehow experimental and risky. In light of the plaintiff's own concessions in this case, medical literature, the district court was wrong to rule against the state. And it doesn't require us to go back into the world we went into in June medical that we'd be the ones doing the appellate fact finding. Judge Higginson, we don't ask this court to do anything like that. We simply asked the court to apply the correct standard of review. Now, we think that the district court fact findings don't require deference for the reasons I discussed in my colloquy with Judge Willard earlier. But even if I'm wrong about that, then we'd simply be in a run of the mill clear error review case. And this this record, given the overwhelming evidence to the safe, available and effective alternatives, it's quite easy to save the district court clearly here without engaging in the type of fact findings that your honor referred to. What did the record say on both sides? If it's disputed about the timing of, uh, when that Jackson is injected, is there evidence in the record that the medical standard of care is to do it 24 hours ahead of time? Well, Chief Judge Owen, the record indicates that die Jackson can take up to 24 hours to work. That does not mean that it usually does. And indeed, the record contains evidence that die Jackson can work quite quickly and far less amount of time, a matter of a few hours. Now, in terms of the practical effects of that, the plaintiffs are suggesting that die Jackson would require yet another trip to the clinic. We don't think that's necessarily true, though. Uh, S. P. Eight, of course, has never been enforced, so we don't know how the providers will comply with it. Um, well, not much. That wasn't my question. My question was when I can't say that very well. That Jackson is used when it was used. What was the standard of care? How was it administered the same day is the abortion of 24 hours before? What was the What's the standard of care evidence on when it's when it's typically administered the timing of the abortion? Yes, Chief Judge. I think the record is not conclusive on that point. I don't think there's one conclusive answer as to how die Jackson is administered. It is widely used. It's used hundreds of times. I don't think there's a definitive answer as to whether what is their evidence that when it's widely used and used hundreds of times that it's used 24 hours in advance or the same day. What's the evidence? I believe there's both types of evidence. In this case, there are providers who administer die Jackson on one day and then complete the D. N. E. Abortion on a different day. Uh, and even if that were the only way to administer die Jackson, even if it did require adding extra day to the process, even if that evidence were undisputed, we don't think that that would change the bottom line analysis all. Of course, the Supreme Court has upheld 24 hour waiting periods. It's upheld sonograms. It's upheld requirements for medication abortions that necessitate two separate trips to the provider. Uh, and so in light of those types of cases, we know that, uh, simply imposing a burden on a woman seeking an abortion does not render regulation unconstitutional. Rather, it's got to be an undue burden, and that's what we're missing here. Mr Hawkins, for those providers that did do it the day before, usually those are in the 20 to 22. Don't they also insert the objects for the dilation the day before they do it as part of that day than everything else? If something else is also being done that day for those who do the dive by Jackson in the record, isn't it true? Yes, Judge Alright on that. That's the answer. I should have given the chief judge. Oh, in a moment ago, I think that's the right way to think about it. The use of the lemon area to achieve the cervical dilation is typically done over two separate days. And the point that I was trying to make is that given that we on effect, we don't know what they're gonna do. But I think there's every reason for this court to think that they could simply do the die Jackson injection before they begin the cervical dilation process. That, of course, wouldn't add any time to the procedure at all. And in any event, given the number of providers who are already using by Jackson in the first place, I don't think it's fair to suggest that the state is somehow imposing an added step or an added requirement when it's something that's happening anyway. My question pertain more to the earlier 16 17 15 16 17 week procedures. It's my understanding. In those cases, they do not need to dilate an extra day that you go in for counseling on one day. You can come back the next day and have the abortion procedure completed. So what would I'm what the standard of care would be in those situations? You wouldn't. You would not give the injection on the same day to give counseling that that would violate the counseling statute. So in those 15 16 17 week cases, you would. You would give the injection the second day, perhaps, and come back a third. That's what I'm exploring. But the record evidence says about that chief, you're showing that is indeed a possibility. I will concede. But to the is concerned about that. It's worth emphasizing that there are alternatives to die Jackson itself at 15 and 16 weeks. The number one alternative that's available is suction, which does not, of course, implicate S. P. A. K. C. L. Injections are another alternative, and the record shows that any provider who can do an intra fetal die Jackson injection can also do an intra fetal K. C. L. Injection. It's the same procedure. The only thing differs is the chemical and syringe. And then, of course, umbilical cord trans section is another available alternative. So to the extent there's any concerns about die Jackson at that earlier stage, I think the record should mitigate those concerns with the other alternatives. Is there any evidence in the record that K. C. L. Has been done outside of a hospital setting outside of a hospital setting? Yes, Your Honor. K. C. L. Is spoken to in Planned Parenthood's materials as I see. I'm out of time. May I finish answering your question? It's spoken. The Planned Parenthood materials speak to K. C. L. Being one of the alternatives to fetal demise, and I don't believe the record indicates that it's required in a hospital setting. Thank you. Mr Wine. Good morning, Your Honors. May it please the court Molly Dwayne for appellees. I have an approximately nine minute presentation, after which always remainder of my uninterrupted time. I'd like to cover four key points this morning. Controlling precedent, the proper legal standard deference to the district court's findings and the scope of relief. First, the Supreme Court has repeatedly held that a ban on the most common method of abortion, and specifically a ban on D. N. E. Imposes an undue burden. Incember versus Carhartt, the court facially invalidated a law whose effect was identical to F B eight. And there is no basis on which to reach a different conclusion here. Because F B eight directly conflicts with finding Supreme Court precedent. The state instead seeks to distract with inflammatory rhetoric. But the these very same argument numerous courts in recent years have struck down laws identical to F B eight as your honors indicated in your questions to my colleague. This includes the 11th Circuit and the Sixth Circuit, and I think it's important to note that the Sixth Circuit record was just as robust as the record here and included evidence from many of the same expert witnesses who testified in Texas. As Judge Higginson noted, the Supreme Court has already denied search in the 11th Circuit case, with Judge Thomas acknowledging Justice Thomas, excuse me, acknowledging in a concurrence to that denial that the law failed the undue burden test, and the results here must be the same. This court should not become the first in the country to allow a D. N. E. Ban to take effect. Second, while unnecessary under Stenberg, even if this court applies the burden standard a new F B eight still failed. The district court already found the F B eight mandate to ensure field demise before every D. N. E. Imposes such severe burdens on abortion access that regardless of whether the laws burdens are considered independently or weighed relative to its benefits, F B eight poses substantial obstacles to abortion. The state claims that under marks Chief Justice Roberts is concurrence in June medical changed the undue burden standard, and that this change in the law alters the outcome here. But this argument is both wrong and irrelevant. Texas claims that this concurrence, an opinion extolling the importance of stardecisis generally, and of the precedent of whole woman's health specifically, somehow also overturned that decision. But as the panel here already concluded, June medical did not alter the undue burden standard. Third, I would like to turn to the district court finding because even if this court disagrees with us regarding the legal standard, it does not change the outcome here. The state cherry picks record evidence from the voluminous trial record that the district court already dismissed as contrary to the weight of evidence at trial. This trial included 19 witnesses and hundreds of exhibits, and the district court findings here are entitled to deference. Primarily, the district court found that the state's proposed methods of demise are unavailable, unreliable, and in some cases, completely experimental. Thus, the district court found that SB-8 operates as a ban on D&E, which is the most common method of abortion after 15 weeks in Texas. Everyone agrees on that point. The district court further found that no method of demise works in every case, and a physician cannot know if demise will be successful until after starting a procedure, at which point it is simply too late to turn back. Rather than risk going to jail for violating SB-8 or violate their own ethical obligations, the district court found that some physicians will stop providing abortion altogether. Yet even if some physicians will continue providing abortions after 15 weeks, the district court correctly found that forcing patients to undergo an unnecessary demise procedure is itself a substantial obstacle. This is because these procedures pose significant health risks to patients, including extramural delivery, infection, uterine perforation, and even cardiac arrest. They are also invasive and medically unnecessary. Digoxin and KCL, for example, force patients to submit to a painful injection with a three to four inch spinal needle inserted through the patient's abdomen or vagina. I'd also like to address some of the state's mischaracterizations of the evidence in the record. Because digoxin causes demise slowly over a 24-hour period, patients must make an additional trip to the clinic the day before their procedure to receive the injection. The district court found that this delay alone was a substantial obstacle. The record clearly shows that no providers administered digoxin on the same day as the D&E procedure. The state also makes much of the fact that the two clinics in Texas that use digoxin do so starting at 18 or 20 weeks, but those physicians do so because they think it is appropriate for their patients at these gestations. Yet these physicians and every expert who testified at trial confirmed that digoxin fails unpredictably in five to 10% of cases, and in those cases, the physician must complete the procedure without demise to protect the patient's safety. These physicians' practice is, in fact, quite different from what SB-8 requires. What SB-8 requires is that all physicians on pain of criminal penalty not just attempt, but ensure demise and do so not just for a minority of patients over 18 weeks, but for every patient after 15 weeks. Tellingly, Texas provides no answer for what a physician should do when a demise attempt fails. The record also clearly shows that digoxin is not used in Texas or anywhere in the country before 18 weeks, and that in Texas, the vast majority of procedures before 18 weeks are done in one day without overnight dilation. Texas next complains that the district court improperly minimized its interest, even though under Chief Justice Roberts' concurrence, the law's burdens alone are sufficient to invalidate the law. But far from furthering the state's interest, the record shows that SB-8 undermines them. To give one example, the record shows that SB-8 is irrational. The state's own fetal pain expert described demise injections proposed by the state not as humane, but as, quote, horrific. Even using the state's terminology, it is irrational to prohibit, quote, live dismemberment with forceps, yet encourage it with suction. The state concedes that suction, just like forceps, causes demise as the fetus is removed from the uterus in pieces. The Supreme Court has already concluded that no state interest can justify a ban on the most common method of abortion. If the state could evade this precedent simply by claiming that a procedure is inhumane, the state could ban every method of abortion, one at a time, until none are left. Ultimately, Your Honors, all of the district court's findings here are well supported by the record and entitled to deference. As Chief Justice Roberts emphasized in June Medical, the question is not whether this court would reach the same findings from the same record, but only if the district court clearly erred. This court was reversed in June Medical for not showing proper deference to the district court and should not commit the same error here. Chief Justice Roberts also recognized that the district court's findings in that case were entitled to deference, even though he clearly thought that there was an error of law. And so nothing in June Medical suggests that the court should question the district court's well-reasoned findings here. Fourth, the state claims that the district court erred in granting facial relief and that individual patients should have to resort to as-applied challenges. In effect, the state asks physicians to force these invasive and unreliable procedures on their patients, and when they fail, which everyone agrees that they will, a patient who is sedated, whose cervix is dilated, whose feet are in stirrups, and who is in the middle of a procedure should then and only then come to court seeking relief. Texas cannot demand this at the price of exercising the constitutional right to abortion. One final note, Your Honors, before I cede the rest of my time, this case is quite similar to the spousal notification requirement struck down in Casey, where the court first described the large fraction test for facial relief. In Casey, there were no precise figures about the number of patients who would be significantly burdened if required to notify their spouses. The Supreme Court even acknowledged that the law wouldn't burden the majority of patients who would already be notifying their spouses of their decision to seek an abortion. Yet the threat of harm for the patients for whom the spousal notification requirement would be a substantial obstacle, whose identities were necessarily unknowable in advance, was sufficient for the court to find the law facially invalid, and the same is true here. For these reasons, we urge the court to faithfully apply Supreme Court precedent, defer to the district court's findings, and affirm that SBA places an undue burden in the path of patients seeking abortion. I'll invite the court's question. Mr. Wayne, you mentioned the district court held, quoting now, that the right to abortion is absolute and the state's interest is given only marginal consideration before fetal viability. That statement is not defensible under existing Supreme Court law, is it? Your Honor, what the Supreme Court has consistently said is they have never upheld a law that prohibits the standard abortion procedure, which is what SBA did here. So I think- Well, what the Supreme Court said in Gonzalez versus Carhartt was that the state's interest is, quote, legitimate and substantial. Seems to me that that undermines the credibility of the district court's entire approach in this case, because the district courts seem to think that the district courts know that that's not true. Your Honor, two responses to that. I think that the court in Gonzalez clearly articulated several principles which are clearly applicable here. The court in Gonzalez upheld a ban on the rarely used DNX procedure precisely because the standard medical option, meaning D&E, remained available. Also, while there was no medical consensus in Gonzalez regarding the necessity or superior safety of the DNX procedure, here, all leading medical groups agree, along with the district court here and every other court to make factual findings on similar laws. D&E without demise is the standard of care, and so nothing in Gonzalez suggests that the court must defer to the legislature when its judgments are contrary to medical consensus, particularly because, as here, there are no legislative findings about fetal demise or anything else. Indeed, the state's methods of fetal demise don't even appear in the statute itself. Mr. Wayne, we've talked a little bit about the 11th Circuit case and the Supreme Court's denial of cert in that case. Picking up on Jeff Smith's question, as I recall in that case, there was record evidence, even though that record was maybe not quite as robust, as opposing counsel puts it, as what we have here, but there was record evidence in that case that abortion access would be extremely limited if that law went into effect. I think there were only two clinics, maybe, in the whole state that performed abortions after 15 weeks. Can you point me, because I know the plaintiffs refer to this as a flat-out ban of the D&E procedure, but can you point me to specific record evidence in this case that discusses how SBA would affect abortion access in the evidence about clinics closing or abortion doctors will stop practicing, anything like that, that shows the effect on access, which was important and kind of cleanly teed up in the Alabama case, but I want to make sure I know the state of the record in this case. Yes, Your Honor, so the district court here concluded that requiring demise is a substantial obstacle, and that was for two reasons. First, because it operates as a ban and so will inevitably reduce abortion access. This is true whenever the state prohibits the most common method of abortion. This is what the Supreme Court recognized in both Danforth and Stenberg. The record evidence on this point is that at least three providers would stop providing abortions if SB 8 took effect, and the citations for those are 2221 to 25 and 2758, and I'll note that one of those... Three of how many? Your Honor, I'm sorry, can you repeat your question? You said three, there's record evidence that three would close altogether, three of how many? In Alabama, there were two that even provided it, and it would all but eliminate access. But I wonder, you say three here, but three of how many? Your Honor, there's no requirement that we demonstrate exactly how many physicians would stop providing abortions, because as the district court found, this law is a substantial obstacle, even if physicians continue providing abortions under it, because forcing patients to undergo a painful and medically risky demise procedure when there's no medical reason to do so is itself a substantial obstacle. I wanted to note that one of those three physicians who said that he would stop testifying was a physician who worked at one of the only two clinics in the state that provided Digoxin, and his testimony was that the risk of criminal penalties from Digoxin failures was so worrisome for him that he would stop providing abortions in Texas altogether. But again, the record evidence here as to burdens goes much farther than those three physicians, as the district court... So why don't you answer Judge Willett's question, three out of how many? Your Honor, there's no evidence in the record about the total number of physicians providing abortion in the state of Texas, but there doesn't need to be. The Supreme Court has consistently recognized that outright prevention, while certainly a burden in itself, is not the only burden that counts as a substantial obstacle. Indeed, in Chief Justice Roberts's concurrence in the June medical decision, he acknowledged many burdens short of prevention, which can amount to substantial obstacles, including increased medical risks and delay in access to procedures. And notably, those are the two of the most significant burdens that are present in this case. And so there's ample evidence in the record as to burdens to demonstrate this law will operate as a substantial obstacle to patients' access to abortion in Texas. So we have absolutely no idea, are you telling us from this record, whether it's three out of five or three out of 10 or three out of 100? Is there anything, is there any reasonable reading of this record from which we can ascertain what is the order of magnitude in terms of, again, three out of how many? Your Honor, there is evidence in the record as to some of the other data about the physicians who provide abortion access in Texas that's located in the plaintiff's derogatory responses. But again, that's it's not necessary here to know the total number of abortion providers. Well, so what is that evidence? You're here in oral argument to help us with the record, among other things, and you're obviously trying to avoid the question. Give us from the record the best estimate of a range or whatever it is that you can as an officer of the court, three out of how many? Your Honor, I don't believe that the record reflects that statistic, but I think it's important to recognize that that sort of evidence isn't necessary to demonstrate substantial obstacles to abortion access, just like in Whole Woman's Health, where there wasn't evidence from every single provider in Texas or every single clinic in Texas about what would happen if the admitting privileges and ASC requirements took effect. The same is true here. Wayne, I take it. I take issue with that. I wrote the Whole Woman's Health case that the Supremes didn't bother to overrule until seven or eight years later. And there was evidence about how many clinics claimed they would have to close in comparison with all the available clinics. Your Honor, that may be true, but again, I don't think that this issue is outcome determinative here. The district court here correctly concluded, based on the weight of evidence presented at trial, that FDA would operate as a substantial obstacle, not just to a large fraction of patients, but for every patient for whom it is relevant. And that's because some patients would be denied abortion access altogether, but the rest would be subjected to an unnecessary medical procedure, a procedure associated with extramural delivery, infection, hospitalization, cardiac arrest. And the district court has consistently held since Danforth that a state cannot regulate abortion in such a way to significantly increase medical risks, which is what the record here shows. And so the district court's findings as to these medical risks, as to the delay, as to the invasive and painful and unnecessary nature of demise procedures, correct me if I'm wrong. Unnecessary, medically unnecessary. And the brief does note that these fetal demise methods are of no benefit to women. They're medically unnecessary. But can you explain why many plaintiffs have and continue to use these methods, even though SBA is not the law? I mean, in other words, why are plaintiffs using these methods voluntarily if they're medically unnecessary and have no benefit? Your Honor, the record clearly demonstrates that a minority of physicians in Texas, as around the country, use Dijoxin because they think it is appropriate for their patients at certain later gestation stages. There is one clinic in Texas that uses it at 18 weeks and one that uses it starting at 20 weeks. And there is a, you know, ample reason for physicians to believe that it carries benefits at those gestations. But what the record here clearly shows and what the district court correctly found is that Dijoxin is never used below 18 weeks, not in Texas, not anywhere else in the state of Texas. So it's not that it would be harmful and expose them to medical risks with no medical benefit, but it would impose an additional 24 hour waiting period on those patients. When in the state of Texas, patients already need to attend a mandatory counseling session in person 24 hours before their procedure. Dwayne, what do you make of Mr. Hawkins' assertion that on the eve of litigation that plaintiffs altered their consent forms, which had previously said Dijoxin was safe? Your Honor, I think that my colleague vastly overstates the evidence in the record. As Dr. Wallace testified during her testimony in this case, the plaintiffs routinely go through their consent forms every year to make adjustments to their forms to reflect the best scientific evidence that is out there. And so it's important to realize here that all of this evidence was already presented to the district court. The district court heard it. It weighed this evidence and nonetheless concluded that requiring Dijoxin for all patients, not just at 18 weeks, but at 15 weeks and above, would be a substantial obstacle for those patients. What are we to make of, there's a study cited in your en banc brief, footnote 13. And the study that you cite concludes, quote, Dijoxin is safe and effective for reducing fetal death prior to the second trimester surgical abortion, unquote. Yes, Your Honor, this evidence was presented to the district court and the district court when weighing it within all of the evidence in the record concluded that it wasn't representative of what the plaintiffs were doing. As I've mentioned, every position that you cite in your en banc brief that footnote 13. Yes, Your Honor, and the reason that we cite that study in our en banc brief is because that statement about Dijoxin being required at, I believe it was a Planned Parenthood affiliate in California. So has nothing to do with Texas, certainly, but that that plaintiff, that that clinic used Dijoxin for all procedures in the second trimester. That was a typo and that the authors of that study have since corrected that issue because what the district court here heard was was very clear evidence that no physicians in Texas and no physicians anywhere in the country are using Dijoxin before 18 years. It would explain. Is there any evidence in the record that that clinic in California is the one where they were ensuring that the abortion procedures would yield organs for for sale? No, Your Honor, there's no evidence in the record about that California provider. This is a case that involves providers in Texas, and that issue has nothing to do with that fact. And let me ask you a question about the state's interests. Are there any state interests that you would credit in this case? Your Honor, the Supreme Court has consistently said that the state has an interest in furthering its interest in potential life, and we can see that that is a valid interest. What we know here is that the record shows that FDA doesn't further the state's interest that it puts forth. Well, I don't know. I'm not familiar with every aspect of the record, but it seems to me that even in high school, if you're going to dissect a frog, you kill him before you start taking him apart. And so I'm not quite sure why the state has no interest in giving a fee, a growing fetus in the womb, the same the same kind of humanity that we would give a frog. Well, Your Honor, I would take issue with that assertion. First of all, the record clearly shows the fetal pain is not possible at the gestational ages. We don't know about frog pain, do we? It's a matter of taking creatures, living creatures and not tearing them apart limb by limb. Your Honor, it's sort of like drawing and quartering. We don't do that anymore either. Your Honor, I would note a couple of things in response. First, the Supreme Court in Stenberg and Gonzalez was presented with the exact same arguments that you're putting forward here and nonetheless concluded that a state could not prohibit the safest and most common method of abortion for patients. Counsel, but in Gonzalez, isn't a prohibition, though. Your Honor, as I tried to explain, it is a prohibition on the way that abortions are performed in Texas. The vast majority of abortions in Texas are not performed with digoxin and even the ones that are. This is very different from what those physicians currently do because it would require physicians to ensure demise when there's no practical or feasible way to do so. And those physicians would subject themselves to criminal penalties, prison time if they're wrong on this matter. But but all of these questions about the state's interests are really not outcome determinative here because as the district court found, the burdens on patients are so extreme that it doesn't matter how you look at this law. It has to fail constitutional review. And that is the way I guess Gonzalez is where I, you know, is a complex decision, maybe not to my view, analyzed sufficiently by the 11th Circuit and especially by the district court here. I have two questions from Gonzalez. The first is, if our focus is the abortive moment. Is it are are you really correct saying this is an additional method being imposed or isn't it actually an alternative? Because I remember in Gonzalez, the Supreme Court even had a sentence saying the the extraction method could be appropriate if there were a chemical demise first. So that suggests to me that at that point, that's not an additional method. They are alternatives. And the second question, if you have a time to get to it, is I did read Gonzalez to be, as Judge Jones may be suggesting, a pretty powerful statement that benefits arise from reputational interests and that euthanasic interests, right or wrong, can be quite high. The question is, did the district court here ever acknowledge that the state has strong euthanasic interests in banning surgical dismemberment when chemical injection alternatives exist? Your Honor, I'll try to answer those questions quickly, if anything, the fact that the demise injections that the state proposes here were known by the by the Supreme Court at the time Gonzalez was decided supports our argument because the court in Gonzalez upheld that rarely used ban precisely because the standard method of abortion, meaning D&E, without demise remained available. And the court never said that a physician would have to do a demise procedure before a D&E. And the same is true here. But it does not discuss the demise method as an alternative. It listed as part of just a different way of doing an addition to the D&E. It doesn't, it never says, well, because you do use this D&E method this way and it's done live, it never contrasts live versus fetal demise. It lists them both as part of D&E in its summary. So there's a dichotomy that's not in Gonzalez. And can you please also address the idea that it doesn't further the interest? I think that's because you think suction also causes live dismemberment. But Gonzalez itself is very pointed that it is not irrational to ban only one method that might cause something. You don't have to do the whole thing in order to not be irrational. So I think the suction argument fails under Gonzalez as well. Can you please address those? Yes, Your Honor, the record here clearly shows that these are additional procedures. An injection with Digoxin requires that the patient come to the clinic for an extra day and receive an injection with a four inch spinal needle inserted through their vagina that they would not otherwise receive. That is an additional procedure. Is that true on 18 to 22 weeks? Because we have to look at the whole thing. 18 to 22 weeks, they would already be there. Well, Your Honor, as the record shows, only about 200 patients out of the 3,000 patients that receive abortions in Texas after 15 weeks are getting Digoxin. So I don't think that... Okay, 16.6 weeks they can do suction, can't they? No, Your Honor. The record clearly shows that suction is not a method of demise that any physicians use and that starting at 15 weeks, physicians must have forceps on hand in order to complete the procedure safely. And then having forceps on hand to complete a procedure doesn't mean that you're not using the suction method to cause the demise. Completing the procedure is not a ban or prohibited in any way by FDA. You can monitor the procedure by removing the tissue or the body parts or however you want to characterize it. Well, Your Honor, as the record shows, a physician cannot know if suction will be possible to achieve demise until after... It doesn't matter, though, because Gonzales v. Carhart also says that it's your intent at the time you begin the abortion, not whether or not... You have this whole argument about dioxin also, that patient safety may say you have to step in and finish the abortion and that's risky. No. If you went in intentionally to cause the fetal demise and it failed in some way and you have to do some patient safety thing, then you can do that because they have a safety loophole in SB 8 on its face. So I don't see how that argument works either.  Can I answer the question? Yes, please. Yes. So, Your Honor, the intent requirement that the court found helpful in the Gonzales decision simply doesn't apply here. The state has taken the position that, for example, in a case where dioxin fails, the physician must do something else to achieve fetal demise. And we're talking about patients who are now mid-procedure, fully dilated. The physician has to figure out something to do. It simply isn't possible for a physician in that situation to accidentally pick up forceps. They would necessarily do so knowing that they would violate SB 8. And the state provides no answer for what physicians in that situation should do. And so I would just ask that this court defer to the district court... Well, can I make sure you have a chance to answer an earlier question? Because I think the conversation went by. I realize that you dispute that there is fetal pain at issue in these particular fact patterns. But let's put that back to the side. Does the state have an interest in preventing and reducing and mitigating fetal pain? May I answer the question? So, Your Honor, the record here clearly shows that fetal pain is not possible at the gestational ages at which abortion is legal in Texas. So the state just does not have that interest here. I did specifically ask you to acknowledge my legal question. You can call it hypothetical. That's fine. And if you don't want to answer, that's fine, too. I just want to make sure you're making the decision not to answer the question. No, understood, Your Honor. And I'm not trying to evade the question. It's just a difficult hypothetical to imagine because the district court here clearly concluded that the neural connections necessary for pain perception do not arise until at least... You can imagine an abortion in theory that causes pain. Does the state have an interest in preventing that pain? Your Honor, the state may have an interest. The Supreme Court has recognized that the state has an interest in furthering potential life. And so to the extent that fetal pain is part of that interest, it would, at least in a hypothetical sense, apply. But again, this court need not reach that issue at all here because the burdens of this law are so extreme that FDA cannot survive constitutional review no matter how you look at it. So we'd ask the court to affirm the district court's findings here. Mr. Hawkins, would you add about three minutes to Mr. Hawkins' time? Thank you, Chief Judge Owen. Just a few points in response. I first wanted to augment an answer I gave to Chief Judge Owen earlier. Chief Judge Owen, you were asking about the record evidence on the use of KCL outside hospital settings. I'll refer you, Your Honor, to page 2420 of the record, which is Dr. Berry's testimony that he performs KCL injections in his office. I'd like to pick up with some questions that Judge Smith was asking earlier regarding the number of providers who might stop performing second trimester abortions or D&E abortions and how that relates to the total number. Ms. Duane is correct that there's no clear number given in the record, but I'd like to see, Judge Smith, if I can be helpful in answering your question. Just looking at back of the envelope math, we know that we've got something like eight or nine clinics in this case as plaintiffs. Now, again, back of the envelope, even if they each had only two abortion doctors and then you imagine maybe there's another half dozen abortion doctors who are not plaintiffs in this case, that alone gives you a number of a couple of dozen, 20, maybe 30. So we're looking at three providers saying they'll stop providing services out of maybe 20, maybe 30, maybe more. I think it's important to contrast that kind of back of the envelope math with what we see in cases like Whole Women's Health, where the Supreme Court made much of the fact that the law at issue would result in closing the number of clinics from 40 down to something like nine. That is a reduction in more than 75%. And on that basis, a bare majority of the Supreme Court was willing to conclude that the Texas regulation was a substantial obstacle in a large fraction of cases. We've got nothing like that in this case. No indication that we have that type of impact on access. And of course, as I was alluding to earlier, no indication that any particular woman will face a substantial obstacle in her path to obtaining an abortion. I'd like to address briefly some of the state's interests in this case. In particular, I wanted to underscore that I think the comment that Judge Elrod made a moment ago is exactly correct. The plaintiffs in this case attempt to impose an all or nothing requirement on the state. They're effectively arguing that the state cannot ban any gruesome procedure, any inhumane procedure, unless it's willing to ban all of them. Judge Elrod put it better than I can, that is directly contrary to Gonzalez, which of course gives state legislatures latitude to pick and choose among competing policy concerns to outlaw procedures they think are the most gruesome and inhumane, so long as there are alternatives available. And indeed, that's exactly the record that we have put on in this case. I'd also like to take issue with, I think, the central theme of my colleague's presentation and her reliance on cases like Danforth and Stenberg. The central theme that the other side is putting forward today is that SBA operates as a ban on D&E abortions. That, of course, is not correct, as I believe Judge Jones and Judge Elrod have noted. SBA is regulating only the moment of fetal demise. The procedure can still continue. All that it requires is fetal demise before the procedure is completed. And as the record shows, and as we've discussed earlier, abortion providers in Texas are routinely causing that fetal demise anyway. I have a question about that. What if, in some situations, the digoxin is administered, but fetal demise does not occur? Can a physician then use forceps to complete the D&E? Or are they required, no matter what, to cause fetal demise before they can use forceps? Your Honor, the physician can use forceps to cause demise in any medical emergency. There is a specific medical emergency. Is that a medical emergency, when the digoxin does not work the first time? No, it's not, Chief Judge Owen. In most cases, that's not a medical emergency. There may be isolated instances where it is. In the Ron over the Mill case, it's not a medical emergency. However, that does not make the law unconstitutional. Because in that situation, there are still numerous alternatives available. The provider can administer a second shot of digoxin. And upon completing two shots of digoxin, the likelihood of fetal demise is virtually 100%. Failing that, there's always the KCL possibility. KCL success rate is close to 100%. There's umbilical cord transection. The efficacy rate of that is 100%. And of course, for up to 17 weeks, LNP suction is available to achieve. I'm just talking about you're already in the middle of the procedure. You use digoxin. It doesn't work. You're saying then you've got to try a second dose of KCL or cut the umbilical cord. But in those circumstances, can you finish the abortion procedure with a not dead fetus with forceps? Your Honor, that would violate SB 8 absent a medical emergency. If there were to be any individual patient for whom that erected a substantial obstacle, whether it was because of some contraindication or some idiosyncratic medical issue, that patient, of course, could pursue an as-applied challenge to this law. And of course, the Supreme Court in Gonzales emphasized that facial challenges are not the norm. They're the exception. But she's on the table, the fetus is living. I'm talking about this is from a physician's standpoint. Do I get prosecuted or not? And you're saying yes. If he or she terminates the pregnancy at that point with forceps, then they can be prosecuted. Your Honor, SB 8 outlaws causing fetal demise using forceps. Now, if the physician does that, if one of the alternatives has not worked, the physician's recourse there is to try one of the other alternatives. Okay, Judge, let me finish this. With regard to suction too? No, Judge. I'm sorry, Your Honor. So, if suction doesn't quite work, you can use the forceps? Well, Your Honor, there's nothing in the record indicating that suction abortions are not effective in achieving fetal demise. All that SB 8 says is that fetal demise cannot be achieved through the tearing off of the unborn child's arms and legs and limbs and body parts using forceps. There are numerous alternatives to causing fetal demise in that way. If the initial shot of digoxin is unsuccessful, there are still many alternatives available that a physician can rely on. If we're talking about the final question about the record, it's a record-intensive case, obviously, with a vast record. There's some anecdotal testimony from physicians, doctors giving their personal experiences when discussing the risk of various fetal demise methods. I wonder, beyond that anecdotal testimony, do the plaintiffs ever undertake to quantify the risks, to show how common the risks of those various fetal demise techniques are? I see I'm out of time. May I answer the question? Yes. So, Judge, the answer is no, they don't attempt to quantify it. They do offer anecdotal evidence or anecdotal stories about the possibility of hypothetical digoxin complications or other concerns like that. I think what this court should look to is the actual record evidence that out of the several hundred abortion complications reported to the state, none of them involved digoxin. I think the key point that I would underscore is that abortion itself is a medical procedure that carries risks and medical uncertainty, and the alternatives to live fetal dismemberment are all safer than the abortion procedure itself. Can I briefly follow up on your colloquy with the Chief Judge? And I think Ms. Duane also alluded to this. If you've not, I think you were acknowledging an extreme situation where an as-applied challenge under current precedent might very well prevail. Obviously, they're alluding to the fact that it's hard to file a lawsuit when you're in that situation with the patients already there. Is your suggestion that there be a defense in a theoretical prosecution, at least? Because you would acknowledge an as-applied lawsuit at that time is unrealistic. I do not dispute, Judge Ho, there would be challenges to an as-applied lawsuit there just as a procedural matter. Judge Ho, as to whether there would be defenses to criminal prosecution, there may well be. The record doesn't speak to that. We can certainly speculate about what some of those might be. Of course, the record doesn't speak to that because we've never been allowed to enforce SB 8. But I want to, I think the broader point, Judge Ho, is I think the court should be assured that the number of women in that hypothetical situation that Your Honor and Chief Judge Owen alluded to is exceedingly small and it's certainly nowhere near the level needed to support facial relief. Thank you, Your Honor. Thank you. That concludes our arguments. We'll take this case under submission. That concludes...